ATTORNEY FOR THE RESPONDENT
Ron E. Elberger
Indianapolis, Indiana

ATTORNEYS FOR THE INDIANA SUPREME COURT
DISCIPLINARY COMMISSION
G. Michael Witte, Executive Secretary
David B. Hughes, Trial Counsel
Allison S. Avery, Staff Attorney
Indianapolis, Indiana

# In the
# Indiana Supreme Court



No. 98S00-0608-DI-317

IN THE MATTER OF:

CHRISTOPHER E. HAIGH,

*Respondent.*

Attorney Discipline Action
Hearing Officer Robert C. Reiling

**May 7, 2014**

**Per Curiam.**

We find that Respondent, Christopher E. Haigh, engaged in conduct in contempt of this Court by egregious violations of this Court's order suspending him from the practice of law. For his contempt, we conclude that Respondent should be fined $1,000.00 and disbarred.

This matter is before the Court on the report of the hearing officer appointed by this Court to hear evidence on the Indiana Supreme Court Disciplinary Commission's "Verified Petition for Rule to Show Cause," and on the post-hearing briefing by the parties. Respondent's 2000 admission to this state's bar and his unauthorized practice of law in this state while suspended subjects him to this Court's disciplinary jurisdiction. *See* IND. CONST. art. 7, § 4.

## Procedural Background

The status of Respondent's law privileges.

By order of June 30, 2008 ("Suspension Order"), this Court suspended Respondent from the practice of law for not less than two years, effective August 15, 2008, for violation of Professional Conduct Rule 8.4(b) (commission of a criminal act that reflects adversely on a lawyer's honesty, trustworthiness or fitness as a lawyer) and Rule 8.4(c) (engaging in conduct involving dishonesty, fraud, deceit or misrepresentation). The violations arose from becoming sexually intimate with two minors on a team he coached, providing alcohol to them, and falsely assuring their parents, their school, and others that he had no inappropriate relationship with them. *See* Matter of Haigh, 894 N.E.2d 550 (Ind. 2008), *cert. denied*, 555 U.S. 1154 (2009). Respondent is currently suspended and has not sought reinstatement.

Respondent has not been admitted to practice law in any state jurisdiction other than Indiana. Respondent was admitted as an attorney at the United States Patent and Trademark Office (the "USPTO") on June 26, 2000, and he was also admitted to practice before several federal courts based on his Indiana admission. *See, e.g.,* N.D. Ill. LR 83.10 (a).

The USPTO filed a Complaint For Reciprocal Discipline against Respondent on November 26, 2008, arising from his Indiana suspension. By order of August 3, 2009, Respondent was suspended as a USPTO practitioner for a period of two years, effective September 3, 2009, over his objections. In addition, Respondent was reciprocally suspended from practice before various federal courts, with his suspensions to run concurrent with his Indiana suspension.

The Commission's contempt action.

On January 6, 2012, the Commission filed a verified petition for rule to show cause against Respondent, alleging that he committed acts in contempt of this Court by, among other things, holding himself out as an attorney or a paralegal and practicing law while suspended. An order to show cause directed at Respondent was entered on January 13, 2012. Respondent filed a

lengthy response with voluminous attachments on March 26, 2012. By order dated February 28, 2013, this Court referred the contempt proceeding to Hearing Officer Robert C. Reiling.

The hearing officer filed a 46-page report ("Report") on November 14, 2013. In a nutshell, the hearing officer found:

> The evidence presented at the final hearing in this matter shows overwhelmingly that, from the time of the Suspension Order through the commencement of the hearing on this contempt matter, Respondent knowingly and willfully engaged in various schemes and stratagems designed by him, with the participation of a few others, to blunt and circumvent the effect of this Court's Suspension Order.

Report at 5. Although Respondent had vigorously contested many of the factual and legal issues during this contempt proceeding, at this point, Respondent does not contest any of the hearing officer's findings of fact and conclusions of law. Rather, the parties dispute only what sanction should be imposed. The Court therefore adopts the hearing officer's findings and conclusions of law, summarizing them below as relevant to the issue of what sanction is appropriate.

### Respondent's Actions in Contempt of this Court

Persons and entities with which Respondent was associated.

The following are persons and entities that play a role in Respondent's post-suspension activities:

➢ "Margco." Margco was an Indiana LLC that Respondent represented and for whom he served as general counsel.

➢ "Schwindt." Jeffery R. Schwindt of Indianapolis was a client for whom Respondent drafted patent applications while Respondent was employed at Barnes & Thornburg, LLP ("B&T"). Respondent joined B&T in 2001 and left before his 2008 suspension.

➢ "AirFX." AirFX was formed on January 29, 2008, by Schwindt, who transferred to AirFX the products he had begun developing through another entity he owned. The hearing officer found Respondent has no ownership interest in AirFX.

- "Opsys." Schwindt formed Opsys in February 2010. It is owned by Schwindt, Respondent, and two others, with Respondent having a one-third ownership interest.

- "TED." Short for "Tissue Extraction Devices," TED is the holding company for intellectual property tied to medical devices, which is apparently owned primarily by Schwindt. Respondent had one-third ownership interest in TED.

- "Lurie." Marc Lurie is a California businessman and non-practicing attorney who owned the internet domain name of <airfx.com>. Respondent, acting on behalf of AirFX, challenged Lurie's use of this domain name.

- "IP Advisors." After leaving B&T and working for two other firms, Respondent formed his own Illinois law firm named IP Advisors in 2006 (before his Indiana suspension).

- "IPXtract." This is a company owned by Respondent that deals with intellectual property, including patents. Its services, including legal services, were marketed to inventors.

- "Oskin." David Oskin became associated with IPXtract as a patent attorney in fall of 2009.

- "Hurley Stanners." This is a Chicago law firm with which Oskin signed an employment agreement in December 2009. Respondent also worked part time for Hurley Stanners as a "paralegal" for about a year from late 2009 to late 2010.

- "Caliber IP." The Illinois law firm of Caliber IP, LLC was created in November 2010, as a vehicle for Respondent and Oskin to provide services, apparently after departing Hurley Stanners. A number of Respondent's former clients became clients of Caliber IP.

- "Zuckerman." Zuckerman Spaeder LLP is a Washington DC law firm. Two attorneys at Zuckerman provided legal advice to Respondent related to his suspensions in various jurisdictions for around six months beginning in mid-August 2009.

The federal regulation allowing a suspended attorney to work as a patent "paralegal."

Federal regulation 37 C.F.R. § 11.58(e) ("the Federal Regulation") allows an attorney suspended by the USPTO to work on matters before the USPTO under stringent limitations:

> An excluded, **suspended** or resigned **practitioner**, or practitioner on disability inactive status who aids another practitioner in any way in the other practitioner's practice of law before the [Patent and Trademark] Office, **may, under the direct supervision of the other practitioner, act as a paralegal** for the other practitioner or perform other services for the other practitioner which are normally performed by laypersons, provided:

4

(1) The excluded, suspended or resigned practitioner, or practitioner transferred to disability inactive status is a **salaried employee** of:

> (i) The other practitioner;

> (ii) The other practitioner's law firm; or

> (iii) A client-employer who employs the other practitioner as a salaried employee;

(2) **The other practitioner assumes full professional responsibility** to any client and the Office for any work performed by the excluded, suspended or resigned practitioner for the other practitioner;

(3) The excluded, suspended or resigned practitioner, or practitioner transferred to disability inactive status **does not**:

> (i) **Communicate directly in writing, orally, or otherwise with a client** of the other practitioner in regard to any immediate or prospective business before the Office;

> (ii) **Render any legal advice or any legal services** to a client of the other practitioner in regard to any immediate or prospective business before the Office; or

> (iii) **Meet in person or in the presence of the other practitioner** in regard to any immediate or prospective business before the Office, with . . . **[a]ny client of the other practitioner**, the other practitioner's law firm, or the client-employer of the other practitioner . . . .

(Emphasis added.)

Respondent's involvement with Margco.

During 2008, the Respondent was doing business with and representing Margco, which was formed by two Indiana businessmen to produce and market a paint brush product. Respondent was a co-inventor of the product with one of the founders, but he was never a member or part owner of Margco.

Respondent commenced negotiations with Margco in early 2008 to become its general counsel. After entry of the Suspension Order, Respondent continued these negotiations with its principals, who did not know about the Suspension Order. Margco entered into the general

counsel "Employment Agreement" with Respondent on September 10, 2008, after Respondent's suspension was effective. During May or June of 2009, Margco's principals learned that Respondent had been suspended before the Employment Agreement was signed.

On June 29, 2009, Margco filed a complaint against the Respondent in the Marion Superior Court requesting a determination that Respondent had fraudulently induced Margco to sign the Employment Agreement. The following day, Respondent was terminated as general counsel and the parties reached a written settlement of all issues between them.

Respondent's activities relating to IPXtract, Oskin, Hurley Stanners, and Caliber IP.

Despite his Indiana and USPTO suspensions, the website Respondent maintained for IPXtract publicly held out Respondent and his company as the "best deal in town" for an inventor to obtain all legal work needed for securing patents from the USPTO. The website made such statements as: "**We** offer an alternative to large law firms and typical invention companies. **We** have ten years of large firm experience procuring patents for standard fees." Report at 19 (emphasis by hearing officer). The Court concludes that Respondent's website for IPXtract constituted maintaining a presence and holding himself out at an office where the practice of law was conducted during his suspension in violation of Admission and Discipline Rule 23(26)(b).

The website for IPXtract listed Oskin as a registered patent attorney. Ostensibly, Respondent worked for Oskin as a paralegal. However, Respondent, as owner of IPXtract, would be the contact person for potential clients responding to the website. Respondent would then purport to be doing "paralegal" work for the clients. Oskin would receive compensation from IPXtract for the patent application work (no doubt performed by Respondent, the hearing officer found) and Respondent would have secured a one-third interest in the profits of the client from its patented inventions (pursuant to its business model and agreements with clients).

In December 2009, Oskin signed an employment agreement with Hurley Stanners to provide intellectual property legal services. The agreement provided that Oskin was required to "supervise, review, and edit, when necessary, all intellectual property related work performed by Chris Haigh [as a] paralegal . . . ." Respondent worked part-time for Hurley Stanners as a

6

"paralegal" for about a year from late 2009 to late 2010. Several clients of his became clients of Hurley Stanners, including Schwindt and his entities. While working for Hurley Stanners, Respondent engaged in direct communication with clients about legal matters, in violation of the paralegal provision of the Federal Regulation. Respondent's actions included traveling to Florida for a full-day meeting with the principals of a client regarding six patents.

Although purportedly a salaried employee, Respondent received pay from Hurley Stanners only if the firm was first paid by the client. The hearing officer found that sporadic, variable payments he received "are not the stuff of wages of a 'salaried employee' . . . . Rather, such are the checks of one sharing in a fee paid by a client to a law firm." Report at 23 n. 18.

Respondent and Oskin created Caliber IP on November 10, 2010. Respondent and Oskin both worked from their respective homes. A number of Respondent's former clients became clients of Caliber IP. Respondent stated that after November 10, 2010, and until at least March of 2013, he held himself out as a paralegal for Oskin and Caliber IP. However, during calendar year 2012 Respondent's income almost doubled Oskin's. Further, Respondent's compensation at $180 per hour (not his billing rate) was more consistent with an attorney than a paralegal.

The Zuckerman attorneys advised Respondent that he "could not work in any capacity for any organization that was doing legal work, whether under the title paralegal or any other title because doing so would be practicing law through a surrogate, and we recommended that he scrupulously . . . comply with the suspension and that an attempt to get around the requirement [in] any clever fashion would be the worst thing that he could do." Report at 13. Although Respondent disputed this testimony, suggesting that the attorneys advised him that he could work as a paralegal for a lawyer or law firm while suspended, the hearing officer found that Respondent's testimony was not credible.

Respondent's activities relating to Schwindt and his companies.

Respondent rendered legal advice to Schwindt and the Schwindt companies after his Indiana suspension, continuing well into 2013. In contrast to his "paralegal" defense described

above, Respondent's defense regarding the Schwindt companies was that he was permitted to take such actions because he had an ownership interest in these companies.

The Lurie litigation. Lurie had registered the internet domain name of <airfx.com> for possible use in connection with his businesses. Lurie received a letter dated February 11, 2010, on IPXtract letterhead signed by the Respondent. In this letter, Respondent purported to write on behalf of AirFX, he stated his legal opinion that trademark owners are entitled to the internet domain names related to their registered marks, he asked that Lurie immediately turn over the rights to airfx.com, and he threatened to initiate legal action against Lurie if he did not.

In April 2011, AirFX filed a Uniform Domain Name Resolution Policy ("UDRP") Complaint against Lurie with the National Arbitration Forum ("UDRP Complaint"). The metadata associated with the UDRP Complaint and a later amendment showed that the Respondent was the author. Neither Oskin's name, nor that of Caliber IP, appears on such pleadings. After receiving an unfavorable UDRP arbitration decision, Lurie filed a lawsuit against AirFX in May 2011 in the District Court for the District of Arizona, (the "Lurie Litigation"). Oskin, of Caliber IP, appeared pro hac vice as counsel for AirFX. Respondent admits that he actively participated in the Lurie Litigation in nearly all aspects. During a recess in a deposition, Respondent spoke with Lurie in a separate conference room to discuss settlement. Respondent told Lurie that he was willing to drop the entire matter if Lurie would drop a grievance that Lurie had filed against Respondent with Indiana. Lurie replied that it would be inappropriate for him to drop his Indiana grievance. Lurie ultimately prevailed in the litigation.

Respondent and Schwindt testified at the final hearing that Respondent has been a 5% owner of AirFX since March 2008, which, according to Respondent, gave him the right to render legal advice and services to Schwindt and his companies, including AirFX. The hearing officer found that the overwhelming credible evidence establishes that Respondent was never a part-owner of AirFX. The hearing officer continued: "But such claim, even if it were true, could not provide Respondent any logical or ethical shelter from this Court's [S]uspension Order. If so transparent a ploy could shelter a suspended lawyer from the unauthorized practice of law, then

8

any suspended or disbarred lawyer could routinely take a nominal or minority interest in their principal entity clients and continue to perform their legal work with impunity." Report at 31-32. "The Hearing Officer believes that it is equally likely that the 'part owner' device would not work in the eyes of the USPTO . . . ." Report at 32 n.29.

Other actions involving Schwindt companies. On June 13, 2011, AirFX filed a lawsuit against J.D. Braun in the United States District Court for the Southern District of Indiana. Oskin appeared pro hac vice for AirFX and Respondent was involved in that litigation. According to an amended complaint, Respondent authored a cease-and-desist letter related to this dispute on June 3, 2009. The top right corner of the letter contained the name "IP Advisors," above the words "intellectual property attorneys." Respondent testified that he thought he was still an attorney at the time due to his then federal court and USPTO admissions. However, the subject of that letter was not a matter then pending in any federal court or before the USPTO.

A similar cease-and-desist letter dated June 1, 2009, was used by Oskin as an exhibit in a suit by AirFX against Custom Cycle Control Systems, Inc., also filed in the Southern District of Indiana during June of 2011. Respondent's participation in this litigation included appearing at a settlement conference with Schwindt.

As to other Schwindt companies, Schwindt testified that Respondent is the Vice President of Opsys and that Schwindt works closely with Respondent on patent applications, which are subsequently given to Oskin for filing. In spring of 2009, Respondent personally received a share of a damages settlement of a patent infringement case filed by TED in the Southern District of Indiana. Respondent was shown as one of the attorneys of record for TED until the District Court reciprocally suspended him.

Litigation involving Schwindt personally. In Schwindt v. Miller, a proceeding before the USPTO, Schwindt attempted to establish co-inventorship of a patent obtained by Miller. The litigation was commenced by Schwindt as early as June of 2011. Although the listed attorneys for Schwindt were Oskin and one Robert Schulman, Respondent was deeply involved in the litigation, testifying that he was far better versed than Oskin about the technology. Emails among

Respondent, Schwindt and others, including attorneys, during 2011 and 2012 show that Respondent was in frequent contact with Schwindt throughout the litigation and was providing draft documents and contributing legal advice and strategy to Schwindt and others. In 2013, a judge on the USPTO Patent Trial and Appeal Board ruled that Schwindt had failed to meet his burden of showing that he should have been named an inventor on the patent.

Respondent, unable to claim any ownership interest in Schwindt personally, asserted that he was entitled to participate in the Schwindt v. Miller litigation because the real party in interest was TED, of which he was a one-third owner. The hearing officer rejected this argument as, at best, sophistry.

Respondent's attitude toward his suspension and duties as a suspended attorney.

Under Indiana Admission and Discipline Ride 23(26)(c), Respondent was required to send notice to clients of his suspension and to file an affidavit stating that the notices had been sent. Respondent did not do so, asserting that he did not have any Indiana clients that fell within the scope of the Rule. However, Respondent did have clients to whom notice should have been given.

About two weeks before the effective date of the Suspension Order, Respondent obtained ten Certificates of Good Standing ("Certificates") from the Clerk of this Court showing him in good standing. Using one of the Certificates, Respondent secured his admittance to practice before the Northern District of Illinois federal court on August 15, 2008, the day his Indiana suspension took effect.

During his meeting on June 30, 2009, with representatives of Margco at which he was terminated as its general counsel, Respondent repeated over and over that he was the only attorney in Indiana ever punished for something that had nothing to do with the law.[1]

---

[1] As noted, Respondent's ethical violations arose from becoming sexually intimate with two minors on a team he coached, providing alcohol to them, and falsely assuring their parents, their school, and others that he had no inappropriate relationship with them. See Matter of Haigh, 894 N.E.2d at 551.

10

In response to the USPTO's Complaint For Reciprocal Discipline against Respondent, he stated that this Court had violated Respondent's due process rights, that his Indiana suspension order was "based on an infirmity of evidence" and "flawed perceptions of the timeline and facts," that this Court had "confused or misunderstood the timeframe of the alleged incidents," that this Court's conclusion that his conduct had been dishonest "cannot be true," and that the then Executive Director of the Commission had ". . . failed to disclose his pre-existing relationship with a chief witness testifying against Respondent." Report at 10. In addition, Respondent stated that his suspension by USPTO would result in grave injustices to his clients because he was "acting as the sole registered patent attorney in hundreds of matters before the Office," showing that he continued to practice law a year after his suspension order. Report at 11.

Respondent's close friend and colleague, Schwindt, attempted to keep Respondent from being suspended in the Southern District of Indiana and at the USPTO, providing a sworn declaration that included: "I am shocked that the state court would/could suspend someone on the accusation of inappropriate behavior.... In effect, he has been sentenced without due process. Hopefully, the Federal court will not blindly follow the state court's inappropriate ruling." Report at 26.

A Zuckerman attorney recalled an email from Respondent saying that he was tired of the roll over and play dead posture and that he wanted to get aggressive. She testified that this email characterized Respondent's general attitude about his suspension predicament.

Blaming his misconduct on the advice of others.

Respondent repeatedly contended that his course of conduct during his suspension was on advice by his Indiana counsel and subsequently the Zuckerman firm. The hearing officer found that testimony of these attorneys did not support that position and that Respondent's effort to attribute any misconduct to advice received from his Indiana counsel was unfounded.

And although Respondent testified that he was advised by the Zuckerman attorneys that he could work as a paralegal under the Federal Regulation and continue his friendships and contacts with his past clients who became clients of his employing attorney, Zuckerman's

11

testifying attorney stated that Zuckerman did not have any discussions with or make any recommendations to the Respondent about this subject. The hearing officer found Respondent's testimony to lack credibility: "The testimony to the contrary of the Zuckerman attorney, the content of the many e-mails between the Zuckerman firm and the Respondent, and the invoice of the law firm for its services, show beyond doubt that Zuckerman did not give advice to the Respondent or others about [the Federal Regulation]." Id. at 16.

## Discussion

This Court's Jurisdiction.

By the time Respondent was suspended, he had moved from Indiana to Chicago, Illinois, and some of his activities during his suspension do not appear to have any obvious connection to Indiana. A threshold question is whether any of Respondent's actions violated his Indiana suspension, subjecting him to this Court's jurisdiction to sanction Respondent for such activities.

The Court concludes that it has such jurisdiction. First, it is clear that Respondent's actions with respect to Margco, described above, violated his Indiana suspension. In addition, this Court's precedent holds that it is a violation of an Indiana suspension order to practice law in federal courts within Indiana.

> The federal courts have no separate or additional test or qualifications required for practice before them. It cannot be said that the practice of law before the federal courts, together with the incidental counseling with clients in a private office for that purpose, is not the practice of law. While we cannot presume to tell the federal courts who they may permit to practice before them nor set the standards, qualifications, or limitations they might place on such persons, **we nevertheless consider the practice of law in the federal courts in this State to be the practice of law for the purposes of this action.**

Matter of Perrello, 270 Ind. 390, 386 N.E.2d 174, 179 (1979) (emphasis added). At this point, Respondent does not dispute that his participation in proceedings in the District Court for the Southern District of Indiana was a violation of his Indiana suspension.

It may be a closer question whether Respondent's activities that may lack connection to Indiana, such as his actions involving cases before the USPTO and the District Court in Arizona, violate his Indiana suspension. However, even if these actions alone would not support this Court's jurisdiction to hold him in contempt for violating his Indiana Suspension Order, we consider his acts in violation of his other suspensions to be aggravating circumstances for the purpose of considering the appropriate sanction.

Sanction.

Direct contempt includes those actions occurring near the court, interfering with the business of the court, of which the judge has personal knowledge. Courts have inherent power to punish summarily acts of direct contempt. Acts of indirect contempt are those that undermine the activities of the court but fail to satisfy direct contempt requirements. Indirect contempt proceedings require an array of due process protections, including notice and an opportunity to be heard. *See* <u>Matter of Nasser</u>, 644 N.E.2d 93, 95 (Ind. 1994). In this case, Respondent is charged with indirect contempt, and we conclude that he has been afforded all the due process protections to which he is entitled.

In considering the appropriate discipline to impose for attorney misconduct, the Court's analysis entails consideration of the nature of the misconduct, the duties violated by the respondent, any resulting or potential harm, the respondent's state of mind, our duty to preserve the integrity of the profession, the risk to the public if the respondent continues in practice, and matters in mitigation and aggravation. *See* <u>Matter of Newman</u>, 958 N.E.2d 792, 800 (Ind. 2011). The same considerations are relevant in deciding the appropriate sanction to impose for contempt of this Court's authority by violating an order of suspension.

The Hearing Officer found the following to be factors counseling in favor of a substantial sanction for Respondent's contempt: his offenses were ongoing and continuous; he engaged in a pattern of deception that was ongoing and intentional; his motives were selfish; he was an experienced practitioner; he was obstructive in his dealing with the disciplinary proceedings by intentionally failing to comply with rules and orders of the Commission; he repeatedly asserted

13

claims without factual basis; and he refused until the last day of hearings to acknowledge the wrongful nature of his conduct.

Respondent suggested to the hearing officer a fine and an extension of his suspension for two years. The Hearing Officer, however, believes that additional suspension will be ineffective because Respondent will continue to engage in the practice of law in one form or another. The hearing officer recommends a fine and disbarment. The Commission agrees and argues that a substantial period of imprisonment should also be imposed. At this point, Respondent states that he is willing to submit to the Hearing Officer's recommendation, asking that the Court not impose the additional penalty of imprisonment.

"Disbarment is generally appropriate when a lawyer . . . intentionally or knowingly violates the terms of a prior disciplinary order and such violation causes injury or potential injury to a client, the public, the legal system, or the profession . . . ." *Standards for Imposing Lawyer Sanctions* (as amended in 1992), Standard 8.1(a). The sanctions a Court may impose for contempt include ordering a fine, disgorgement of ill-gotten gains, imprisonment, and extension of an attorney's suspension or removal from practice. *See* Matter of Freeman, 999 N.E.2d 844, 846 (Ind. 2013); Matter of Nehrig, 973 N.E.2d 567, 569 (Ind. 2012). We conclude that the Court's arsenal of sanctions for contempt includes disbarment in egregious cases.

Respondent's violation of the Suspension Order was on-going, pervasive, and deliberate, and it exposed the public to the danger of misconduct by an attorney who has yet to prove his remorse, rehabilitation, and fitness to practice law through the reinstatement process. *See* Admis. Disc. R. 23(4)(b). Under these circumstances, the Court concludes that a fine of $1,000.00 and disbarment is warranted. The Court cautions that any further contempt by Respondent will likely result in imposition of a period of imprisonment.

## Conclusion

The Court concludes that Respondent engaged in conduct in contempt of this Court by his egregious violations of the Court's Suspension Order. For Respondent's contempt, the Court

disbars Respondent from the practice of law in this state effective the date of this opinion. Respondent shall fulfill all the duties of a disbarred attorney under Admission and Discipline Rule 23(26).

In addition, the Court orders that Respondent be fined the sum of $1,000.00. Respondent shall remit this amount within 60 days of the date of this order to the Clerk of the Indiana Supreme Court, Court of Appeals, and Tax Court.

The costs of this proceeding are assessed against Respondent. The hearing officer appointed in this case is discharged.

The Clerk of this Court is directed to give notice of this opinion to the hearing officer, to the parties or their respective attorneys, and to all other entities entitled to notice under Admission and Discipline Rule 23(3)(d). The Clerk is further directed to post this opinion to the Court's website, and Thomson Reuters is directed to publish a copy of this opinion in the bound volumes of this Court's decisions.

All Justices concur.