## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Sep 28 2017, 10:14 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEYS FOR APPELLANT

Amy O. Carson
Massillamany & Jeter LLP
Fishers, Indiana

Matthew Strzynski
Indianapolis, Indiana

ATTORNEY FOR APPELLEE

Bruce M. Pennamped
Cross Pennamped Woolsey
& Glazier, P.C.
Carmel, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

William L. Koss,

*Appellant-Respondent,*

v.

Karen J. Koss,

*Appellee-Petitioner.*

September 28, 2017

Court of Appeals Case No.
29A02-1611-DR-2455

Appeal from the Hamilton
Superior Court

The Honorable William J. Hughes,
Judge

Trial Court Cause No.
29D03-1406-DR-6306

**Mathias, Judge.**

[1] William Koss ("Husband") appeals the Hamilton Superior Court's decree dissolving his marriage to Karen Koss ("Wife"). Husband raises several issues, which we consolidate and restate as:

1. Whether Koss established that the trial court was biased against him;
2. Whether the trial court abused its discretion in calculating the value of certain martial assets;
3. Whether the trial court properly considered the inheritances and gifts from Husband's family when it divided the martial estate;
4. Whether the trial court abused its discretion when it considered a failed business as dissipation of marital assets; and,
5. Whether the trial court abused its discretion when it ordered Husband to pay the bulk of Wife's attorney fees and expenses.

[2] We affirm in part, reverse in part, and remand for correction of the judgment accordingly.

## Facts and Procedural History

[3] Husband and Wife were married in 1984 and have five emancipated children. The parties separated on June 30, 2014. The marital estate consists of businesses, real estate, and significant personal property. The trial court's division of the marital estate was complicated by differing valuations for the assets, assets obtained through inheritance or gift, Husband's dissipation of assets, and Husband's failure to disclose certain assets prior to the final hearing.

[4] Husband was, to be generous, an extremely difficult litigant both during the discovery process and during the dissolution hearing. Husband consistently attempted to frustrate Wife's attempts in discovery to obtain information about their marital assets and debts. In addition, the court had to exert its authority to

remedy Husband's decision to try and hide assets two or three times before the final hearing. Tr. Vol. 2, p. 122.

[5] Almost two years after Wife filed her petition for dissolution, the final dissolution hearing was held. On July 19, 2016, the trial court issued detailed findings concerning the valuation of the parties' assets. Certain findings are reproduced below to demonstrate the complicated nature of this dissolution and the trial court's thoughtful approach to its division of the marital estate:

> 9. At the time of the marriage and thereafter, frequent and substantial gifts were given to the [Husband] and [Wife] by the [Husband]'s parents. In addition, substantial inheritances were received upon the death of the Husband's Father and the subsequent death of Husband's Mother. It is unclear from the record herein whether the inheritances and gifts were always directed solely to the [Husband] or made jointly to the parties or if both circumstances occurred. The manner in which the inheritances and gifts were received are of little consequence because the inheritances were used jointly by the parties and the funds received were commingled with other marital funds and properties.
>
> 10. [Wife] worked for the first two years of the marriage, and then she came home to raise the five children. She home schooled the children and took care of the home front until the two youngest children were in the 7th and 8th grade. At that time the youngest children entered public schools, and the [Wife] returned to teaching. She has been a full-time teacher at Tipton High School for the past 8 years. She earns an annual salary of about $49,000 per year. The Court finds that she is fully and appropriately employed.
>
> 11. [Husband] has been engaged in a variety of business ventures during the marriage. His primary employment has been with

Capital Machine, a company begun by [Husband]'s family and later conveyed to Husband by gift and through inheritance. This company is now owned 51.5625% by [Husband] and 48.4375% by the parties' son Peter. Peter acquired his interest in Capital Machine by way of gift from the parties. In addition, the [Husband], [Wife] and Peter own Indiana Forge, LLC with [Husband] owning 10%, [Wife] owning 45% and Peter owning 45%. Peter also acquired his interest in this entity as a gift from the parties. Both of these businesses are related to the veneer manufacturing industry. Capital makes large machines used to make veneer. Indiana Forge owns real estate upon which Capital is located and real estate with some timber associated with it in Parke County Indiana. Some years ago, Husband began a veneer manufacturing company, hereinafter frequently referred to as the veneer mill, which proved unsuccessful and ended in bankruptcy. This business failure devastated the financial net worth of the parties, and as of the date of the final hearing this marital estate has yet to fully recover from this event. In order to meet the substantial obligations of the parties resulting business failure, assets of the marriage were liquidated and substantial sums received in inheritance at the death of [Husband]'s Mother were applied to clear title to joint marital assets, specifically the marital residence . . . The marital estate is in general comprised of items left after this financial devastation.

12. [Wife] was opposed to the veneer mill venture, but the [Husband] proceeded anyway. [Wife] acquiesced and executed many documents necessary to fund this startup operation. [Wife] to this date is unable to describe exactly how the funds for this venture were raised, but it appears that nearly everything the parties owned was put at risk. The business failed in part due to the effects the advent of a global economy has had upon the veneer industry, but the decision to risk the entire marital estate of the parties to fund this venture was solely the decision of the [Husband].

13. Most of the estate was lost in the failed business venture and most of what is left for division herein w[as] the direct result of substantial gifts made to the parties by the [Husband]'s parents during the years of the marriage, and the hard work of both parties. (emphasis in original). While [Wife] did not bring substantial dollars to the marriage, she brought substantial services in the rearing and home schooling of five children and providing a comfortable and welcoming home for the parties and their children.

14. The identification of the contents of the marital estate and the value to be properly assigned to these items has been very complicated herein. A review of the CCS will indicate a number of hearings before this Court to enforce discovery. It is abundantly clear that from the day this action was filed, the [Husband] has engaged in a game of hide the football to obfuscate and frustrate the division of this estate. On each day of trial, a new instance of the willful and intentional attempt to conceal assets was revealed. These revelations ranged from the discovery of in excess $275,000 in cash and gold coins in an office desk drawer on the first day of trial, to the wooden box containing a coin collection worth thousands of dollars discovered locked in the master bedroom closet; to the removal of a zero-turn radius mower from the residence to the business premises where it was conveniently not appraised. The boldness of the [Husband] is displayed by his willingness to perjure himself in Court in order to hide marital assets from proper division in this action to dissolve his marriage of over 30 years. That boldness is breathtaking, the result of this conduct is that the Court finds the testimony of the [Husband] to be wholly unworthy of credibility. The Court also finds that the primary reason for the substantial fees incurred by both parties was the result of [Husband] apparent intentional plan to cheat the [Wife] of her fair share of the estate. Husband spent thousands hiring experts who would overlook the obvious and low ball the value and accept his less than credible word as to the contents of the

estate while Wife was forced to spend thousands to identify and quantify the assets still owned by the parties.

*** 

17. [The marital residence] was completely renovated by the parties' [sic] during the marriage in a process for which no expense was spared. The residence was held free and clear before the veneer mill bankruptcy. This residence was nearly lost in the business failure because a mortgage had been taken on the residence to partially fund that venture. The Residence was saved from foreclosure only when the mortgage taken out on the residence to fund the mill was paid after the [Husband] received his inheritance from his mother. The Court finds that this residence should be set over to the Wife. It was paid for the first time, at least in part, from joint efforts of the parties, and while it was paid for the second time from the Husband's inheritance, which was only because of Husband's ill-advised decision to risk the family estate to fund the failed veneer mill.

18. An adjacent 42.07 acre parcel is owned as tenants in common by [Wife], [Husband] and three of their Children, Mary, Sarah and Ruth. It was conveyed to these five individuals by Jack Koss, [Husband]'s Father on January 4, 1993. Each of the five individuals owns an undivided $1/5^{th}$ interest as tenants in common. The value found herein was based upon the appraisal of Jeffrey Juday. Mr. Juday opined that the entire parcel was valued at $841,400 but this total value should be discounted by $126,210 due to marketability concerns. This resulted in a value of the 2/5 interest which is part of the marital estate at $286,076.00. At trial, but only at trial, [Husband] consented to the underlying value of the real estate but continued to object to the marketability discount as evidenced by his proposed findings. The Court finds that the value opined by Mr. Juday with a discount for marketability is the value of this asset.

19. The parties own a 20 acre parcel of real estate described as Section 17, Township 18, Range 3. This parcel was valued at

$440,000 by Mr. Juday. At trial, but only at trial, [Husband] consented to this value being used. The Court finds that the value agreed by the parties is the appropriate value for this item of property.

20. A parcel of vacant land was sold by the parties on May 11, 2015 for which the parties received net proceeds of $92,600.00. The Court finds the value of this property disposed of in the course of the dissolution was $92,600.

21. On or about March 6, 2014, the parties sold a parcel of real estate to Kurt and Carol Homan for $500,000. Carol Homan is the sister of [Husband]. The transaction was for the sale of about 35 acres immediately contiguous and abutting the marital residence on two sides. The proceeds of this sale were used to resolve a portion of the debt on the marital property arising from the failed veneer mill. . . .

*** 

24. Personal property in the residence of the parties was valued by Robert J. Brown in a written appraisal dated March 16, 2016. Mr. Brown is a personal property appraiser well known to the Court by way of his written reports. This is the first case in which Robert J. Brown has ever personally testified in Hamilton Superior Court 3 although his reports have frequently been relied upon by the Court in division of marital estates. The Court finds Robert J. Brown to be knowledgeable, credible and wholly believable on the issue of personal property valuation.

*** 

29. On December 8, 2014, Robert J. Brown appeared at the residence to inventory and appraise equipment at the machinery shed located at the Residence, now on the Homan property. He appraised the following items 1974 John Deer Tractor with loader, Bush Hog SBX84, two Fuel tanks on stands, John Deere 709 Rotary Cutter, John Deere Model 31a post hole digger, John Deer weights on stands, Snyder 3 point hitch rear mount tank,

19563 McCormick Farmall Super M, 1944 McCormick Farmall H tractor, three hay wagons, wooden outhouse, Reynolds Lowther tree planter, Tree cage, John Deere 36" roller, 1997 Corn Pro trailer with ramps, Troybilt rototiller, Wood Miser Model LT40H024, three "Hit and Miss" engines, one lot of hand tools specifically described in Brown written report found at Ex. 42 herein. The Court finds Mr. Brown's appraisal of $24,350.00 to be a true and credible fair market value of these items.

30. Whether the items listed in paragraph 29 above should be valued in the marital estate is contested. There are three bills of sale at issue in this case in which [Husband] has purported to sell to third parties martial assets. One bill of sale dated May 16, 2013 purports to convey ownership to the items listed above, along with several other items not listed in the inventory completed by Brown, to Garett Shoffner. See Exhibit 5. Apparently, most of these items remain in the machinery shed adjacent to the marital residence to upon which the [Husband] has a 20 year license to store equipment. According to the bill of sale, Shoffner had three years of free storage for these items at the machinery shed. Some of the items are listed in a bill of sale from [Husband] to Garett Shoffner dated May 16, 2013 were not located in the shed at the time of the Brown Appraisal including at least a manure spreader and horse shoeing stock. According to this bill of sale the items listed above and at least three other categories of items, generators, Scag 72" mower, and pressure washer were sold for a total of $2,200.00. [Husband] claims to have retained a right of first refusal to purchase any of these items back if Mr. Shoffner receives a bona fide offer to purchase them in writing. As of the last day of the final hearing, the items listed in that bill of sale remain either at the machinery shed or are stored at the Capital Machine Business premises except for the horse shoeing stock and the manure spreader. The items sold to Shoffner in the first bill of sale dated March 16, 2013 are not marital assets and the Court has not included them in the Marital Estate. However, [Husband] received $2,000 for these items of property which had a much higher value. The Court finds that this transaction was

made prior to the date of filing and the final separation of the parties, but after the physical separation of the parties and during the period of their estrangement. This transaction constitutes dissipation of the marital estate by the [Husband] which shall be considered in the equitable division of the marital estate.

31. The Court finds that there is more than sufficient evidence to believe that this first bill of sale to Shoffner may have been yet another effort to hide assets from the [Wife] and may in fact be a sham transaction. Because Garett Shoffner is not before the Court the Court cannot undo the transaction, however, in this transaction [Husband] reserved a right of first refusal to repurchase the items from Shoffner in the event of a bona fide offer from a third party. The Court finds that this is a marital asset, an intangible chose in action, subject to division which has not been valued by the parties and which cannot be valued by the Court from the evidence in this record. The Court finds that this chose in action should be divided in kind.

32. A second bill of sale to Shoffner dated June 7, 2014 is also at issue. This sale was for items discussed in the appraisal done by Mr. Brown on the first day of trial, and specifically, the guns and wood working tools discovered at Capital Machine during that appraisal. Although these items have been found not to be marital assets, the right of first refusal is an asset. This asset has not been valued because the record herein does not permit its value. This asset will be divided in kind. The Court finds that there is more than sufficient evidence to believe that this second bill of sale to Shoffner may have been yet another effort to hide assets from the [Wife] and may in fact be a sham transaction in the very least it is dissipation of marital assets.

33. A third bill of sale is in existence for a purported sale to Bobby Deckard on May 25, 2014. This bill of sale did not retain a right of first refusal, and the sale having occurred prior to the date of filing the items sold are martial assets subject to division herein. There is more than sufficient evidence in this to result in a belief that this sale may be a sham transaction and at the very

least was a dissipation of the martial estate by the [Husband]. It is unclear from the record what the effect of that dissipation might be.

\*\*\*

36. On April 8, 2016, Robert J. Brown submitted a written report of assets he appraised after the commencement of trial. On the first day of trial, [Wife] presented evidence that there were several items of property at the Capital Machine offices which had not previously been inventoried or valued, specifically gold coins, cash and certain items of personal property alleged to have been sold in May 2013 and June 2014. Prior to being confronted with documentary evidence during trial, [Husband] had denied that any of these items existed. The first category is 13 listed firearms and ammunition located at Capital Machine. These items are inventoried at second and third page of [Wife]'s Exhibit 43. Mr. Brown was assisted in the valuation of the firearms and ammunition listed here by Mr. Higginbotham. These items have a value of $13,300.00. [Husband] claims to have sold these items to Garrett Shoffner along with certain wood working tools for $2,000 on June 7, 2014 as evidenced by the bill of sale admitted as [Wife]'s Exhibit 7. This record is replete with evidence that this bill of sale may have been a sham intended to hide marital assets from the [Wife]; however, the bill of sale is dated on June 7. 2014, 23 days prior to the date of final separation. This Court cannot undo the transaction represented by the bill of sale. However, the Court notes that the transaction is clearly below market value and considers this transaction to be a dissipation of assets. The Court concludes that his dissipation is worth at least $12,300.00.

37. The next item valued by Robert J Brown in his April 8, 2016 report is identified as the "Lie Nielsen Tool Works Inc." with a value of $1225.00. These items were also located at Capital Machine and were not valued in the valuation of Capital Machine equipment. They constitute wood working tools as per the inventory of this item appearing at the 20th page of Exhibit 43.

[Wife]'s Exhibit 7, the June 7 2014 Bill of Sale to Shoffner indicates that [Husband] was conveying to Shoffner his wood working equipment as part of the overall transaction for which he received a total of $2,000.00. The record is replete with evidence that this bill of sale may have been a sham intended to hide marital assets from the [Wife]; however, the bill of sale is dated on June 7, 2014, 23 days prior to the date of final separation although during a period of the parties' estrangement and their physical separation. This Court cannot undo the transaction represented by the bill of sale. However, the Court notes that the transaction is clearly below market value and considers this transaction to be a dissipation of assets which the Court concludes in valued at $225.00.

\*\*\*

39. The next item valued by Mr. Robert J. Brown on April 8, 2016 is the most troubling for this Court. On the first day of trial, [Wife] provided evidence to the Court that on the day preceding trial there were a number of gold and other coins along with a substantial sum of cash located at the Capital Machine premises in the desk drawer of the desk used by [Husband]. [Husband] had just denied that these items existed, and specifically testified that only petty cash was maintained at the premises and never in a sum in excess of about $1,000 to $1,500. As a result of this apparent inconsistency, the Court interrupted the proceedings and ordered several things to occur. First, the Court ordered that Robert J Brown be granted access to the business premises to inventory property and specifically gold coins and cash located in the desk drawer of [Husband] but also to search for guns, woodworking equipment and other "missing items of personal property." Second, the Court detained [Husband] while this inspection occurred, and ordered that [Husband] remain under the watchful eye of the Hamilton County Sheriff pending a Direct Contempt of Court hearing to be held later that afternoon. The Court ordered that [Husband]'s attorney, Arvin Foland, was permitted to travel to the Capital Machine premises to be present

during the Brown inventory and appraisal. Third, legal counsel was appointed for [Husband] to represent him at the direct contempt hearing. Fourth, a written order to show cause was entered by the Court. Fifth, a summary trial was conducted at which [Husband] was permitted to show cause why he should not be held in direct contempt of court for lying during his testimony before the Court. Sixth at the summary contempt proceedings, [Husband] was found not to be in contempt of Court as charged because of a technicality. That technicality was that at the time of [Husband]'s false testimony regarding the presence of gold coins and cash, he had inadvertently not been placed under oath. Trial was recessed and set to recommence the following morning.

40. Mr. Brown in his appraisal at Capital Machine premises discovered and inventoried a substantial quantity of gold and other coins as detailed in his April 8, 2016 report at pages 3 through 14. The value ascribed to these gold and other coins was $231,660.00. Discovered with these coins were certain trading documents, which by and large, indicate that a substantial number of the gold coins had been purchased by Jack Koss or by [Husband] with a direct reference to Capital Machines. There is one notable exception that being a lot of 200 American Eagle one ounce silver dollars purchased on May 2, 1999 by a check on the joint account of the parties and an invoice for the same transaction in the name of [Husband] at [address of marital residence omitted] with a ship to address of [Husband], c/o Capital Machine Co. 2801 Roosevelt Avenue, Indianapolis Indiana. Brown inventoried 23 total American Eagle One Ounce Silver Dollars, 20 were issued in 1999 and three were issued in 2008.

41. An issue exists as to the ownership of the coins described in paragraph 40 above. These coins are not reflected on the books or records of Capital Machine. They were not inventoried nor valued by any of the business valuation experts who opined on the value of Capital Machines. At least 20 of the silver Eagles

were found with documents indicating they were purchased from the joint funds of the parties, but all other purchase documents found for the coins lists either Jack Koss or [Husband] on behalf of Capital Machines as the buyer. The Court finds that these coins except for the 20 Silver Eagles dated 1999 with a value of $340.00 are property of Capital Machine and part of the marital estate only because Capital Machine is part of the marital estate. The Court finds that [Husband] used his position as the Chief Operating Officer of Capital Machine to attempt to conceal and hide this significant asset in order to deflate the value of the marital estate and to cheat his spouse from receiving a full consideration of the value of the marital estate. While such conduct is unacceptable, it does not change reality as to the ownership of the coins at issue. It does substantially reduce, if not eliminate any credibility of the [Husband]'s testimony herein and all other testimony which is dependent upon the statements of [Husband].

42. The next category inventoried and valued on the April 2016 appraisal report is a substantial sum of cash. The cash found by Mr. Brown in his inspection of the [Husband]'s office has a face value of $43,248.00. [Husband] claims after the discovery that this is cash that belongs to Capital Machine and which had been squirrelled away for a rainy day. [Husband] claims it is an asset of Capital Machine and not a martial asset. Prior to its discovery, [Husband] had denied that there was any cash at all at Capital Machine except for a file containing petty cash, never more than $1000 to $1500 at any given time. Unlike the gold and other coins, listed above, this cash has no provenance or documentation of ownership. This cash does not appear on the books and records of Capital Machine. This cash was not considered in the valuation of the business by either of the business evaluation experts presented by the parties. The only evidence that this cash has a connection to Capital Machine is the unsupported testimony of [Husband]. That testimony is without a scintilla of believability. This cash which was found in

the residential quarters of [Husband], albeit his office at Capital Machine, is a marital asset to be divided separately herein.

43. On the Third Day of Trial, [Wife] appeared at trial with a bag of coins in hand which was marked as Exhibit 35. This Exhibit was later replaced by Exhibit 36 which is 22 pictures of the bag and its contents admitted as Exhibit 35. Exhibit 35 was then released to the [Wife] so that it could be appraised. Robert J Brown conducted an inventory and appraisal of these items as detailed in pages 21-23 of his April 2016 appraisal report. These items were found in a locked box on the dresser of [Husband] in the closet of the master bedroom. [Husband] had on prior occasions, before being confronted with exhibit 35, denied that he had any collections not previously disclosed. When confronted with Exhibit 35, [Husband] finally admitted that the coins contained therein were his personal coin collection. These items were valued at $4,765.99 by Mr. Brown. These items were owned prior to the date of final separation as evidenced by the fact the box in which they were found was locked and on the dresser in the master bedroom of the martial residence on the date of the filing of this dissolution and at all times thereafter until the evening of the second day of trial herein. As a marital asset these items are required to be divided herein. The court has rounded the value of this item to the next whole dollar and finds the value to be $4,766.

44. In his April appraisal report, Mr. Brown also inventoried certain lawn equipment located at Capital Machine that was not included on the business equipment inventory of Capital Machine. This equipment has been secreted at Capital Machine during the pendency of this matter by the [Husband]. This equipment is noted at page 24 of the April 2016 report and has a value of $4,700.00. These items of equipment are found to be marital assets belonging to the parties but stored at Capital Machines. The items have a value of $4,700.00.

***

53. The Court has valued the parties' 51.625% interest in Capital Machine at $931,589.00. This value has been calculated from the valuation report of Bret Brewer by adding the sum of $231,320 to the December 31 indication of value found on page 7 of Mr. Brewer's Report and the same number to the December 31, 2014 indication of value on the same page of the report and then completing the balance of the calculations on that page. This recalculation results in a sum of $831,588.87 for the parties' interest in Capital Machine which the Court has rounded to the next whole number, $831,589.00.

54. The Court finds that the values submitted for the Capital Machine entity by Lighthouse Advisors to be wholly without credibility because that value is based solely upon information supplied by [Husband] or information from third party appraisers whose values are based upon information derived solely from the [Husband]. As noted above, the [Husband] is without credibility. Because the Lighthouse report is based upon information from a non-credible source the resulting report is not entitled to credibility.

55. The Court has valued the Parties' 55% interest in Indiana Forge at $208,500. This value is the value assigned by Bret Brewer in his valuation report. The Court has not made adjustments to that value herein because there were no later discovered assets of Indiana Forge.

56. The Court finds the values submitted for the Indiana Forge entity by Lighthouse Advisors to be wholly incredible because they are based solely upon information supplied by [Husband] or information from third party appraisers whose values are based upon information derived solely from the [Husband]. As noted above, the [Husband] is without credibility. Because the Lighthouse report is based upon information from a non-credible source the resulting report is not entitled to credibility. The Court notes that Lighthouse assigned a value to this interest that exceeds that of Mr. Brewer by the sum of $3,500.00.

Appellant's App. Vol. II pp. 33–55.

[6] Based on these findings, the trial court ordered a slightly unequal division of the marital estate awarding 52.37% of the marital estate to Wife and 47.63% to Husband. The significant assets awarded to Husband were the two businesses, the value of which had been vehemently contested by the parties. The court also ordered Husband to pay $79,000 of Wife's attorney fees and expenses.

## Alleged Bias of the Trial Judge

[7] It is well settled that adjudication by an impartial tribunal is one of the fundamental requirements of due process imposed on the courts of this state by the Fourteenth Amendment to the federal constitution. *Tumey v. Ohio*, 273 U.S. 510, 535 (1927); *Blanche v. State*, 690 N.E.2d 709, 714 (Ind. 1998). Judges are presumed impartial and unbiased. *Garland v. State*, 788 N.E.2d 425, 433 (Ind. 2003). "[T]he law will not suppose a possibility of bias or favour in a judge, who is already sworn to administer impartial justice, and whose authority greatly depends upon that presumption and idea." 3 William Blackstone, Commentaries 361.

[8] The Canons of Judicial Conduct require a judge to "act at all times in a manner that promotes public confidence in the independence, integrity, and impartiality of the judiciary." Ind. Code of Judicial Conduct, Canon 1, Rule 1.2. In addition, "a judge shall uphold and apply the law, and shall perform all duties of judicial office fairly and impartially." Jud. Cond. R. 2.2. And "[r]ecognizing the well-settled due process right to an impartial court as necessary to a fair

proceeding," our supreme court has "found fundamental error when trial judge's comments, demeanor, or conduct indicated bias." *In re J.K.*, 30 N.E.3d 695, 700. *See also Hewitt v. Westfield Washington Sch. Corp.*, 46 N.E.3d 425, 435 (Ind. 2015) (stating that a "biased decisionmaker [is] constitutionally unacceptable [and] our system of law has always endeavored to prevent even the probability of unfairness") (citation omitted).

[9] Because the law presumes that the trial court is unbiased, "the party asserting bias must establish that the trial judge has a personal prejudice for or against the party. . . . Adverse rulings and findings by the trial judge do not constitute bias per se." *Richardson v. Richardson*, 34 N.E.3d 696, 703 (Ind. Ct. App. 2015). "[A] party must show that the trial judge's action and demeanor crossed the barrier of impartiality and prejudiced that party's case." *Id*. at 703–04.

[10] Importantly, a trial judge is also afforded wide

> "latitude to run the courtroom and maintain discipline and control of the trial." *Particularly in bench trials*, courts have considerable discretion to question witnesses sua sponte "to aid in the fact-finding process as long as it is done in an impartial manner." We even tolerate a "crusty" demeanor towards litigants so long as it is applied even-handedly. Yet judges at all times "must maintain an impartial manner and refrain from acting as an advocate for either party," –because a "trial before an impartial judge is an essential element of due process[.]"

*In re J.K.*, 30 N.E.3d at 698–99 (internal citations omitted and emphasis added).

[11] In this case, on the first day of the final dissolution hearing, Wife presented evidence obtained eleven days prior to the final hearing that Husband retained possession of assets allegedly sold to a third party and had failed to disclose marital assets to Wife. Wife presented photographs to the trial court to establish that those assets were located at Husband's place of business. Wife did not list the newly discovered assets on her financial declaration of the marital estate. In prior deposition testimony, Husband testified that certain items shown in the photographs had been sold to Garrett Shoffner prior to the parties' separation. The terms of the sale required Husband to allow the third party to store the items in a shed at his residence for free. Wife alleged that Husband retained ownership of the items that were allegedly sold to Shoffner. Other items shown in the photographs, including cash and numerous gold coins, were not listed on Husband's financial declaration or in his discovery responses.

[12] The trial court decided that Wife's appraiser and Husband's counsel would meet at Husband's office to inventory and appraise the non-disclosed assets and the dissolution hearing would resume the next morning. The trial court determined that Husband would be held in the Hamilton County Jail until a direct contempt hearing could be held later in the day and stated:

> [Husband], you have sworn on an oath before this Court to tell the truth, the whole truth, and nothing but the truth during the course of your testimony today. I am giving you instructions that I believe you have violated your oath before this Court, and that you have testified in a manner that is less than honest. I therefore am giving you the opportunity at 3:30 today to stand before this Court and explain why you should not be held in contempt of

this Court for your willful violation of that order by lying under oath.

In the meantime, I am ordering that you be incarcerated by the sheriff of Hamilton County pending your reappearance in this court at 3:30 today for the purpose of answering why you should not be held in contempt of court.

Tr. Vol. 2, p. 124. The court then appointed counsel to represent Husband at the contempt hearing. Husband asked if he could "give an explanation" to the court, and the court denied his request. *Id*. at 124–25.

[13] At the beginning of the direct contempt hearing, the trial court detailed the events and testimony that had occurred that morning and noted the time of each event down to the second. For example, the court noted that Husband's deposition was admitted at 10:37:30 a.m. Tr. Vol. 2, p. 128. We can infer from the trial court's thorough review of the hearing and its later statement, which is quoted below, that while Husband was in custody, the court became aware that Husband had not been sworn in before testifying that morning.

[14] Continuing with the direct contempt hearing, the trial court alleged that during the final dissolution hearing under direct examination,

[Husband] identified a financial declaration signed by himself in December 2014 under penalties for perjury. The examination continued at approximately 11:31:16 a.m. [Wife]'s Exhibit 11 was displayed to the [Husband]. Exhibit 11 was a series of seven pictures. These were identified as pictures taken at Capital Machine of items sold to Shoffner[.]

*Id.* at 129.

[15]   After listing the items in the pictures, the court continued with the allegation and stated: "In his testimony before this court on this date, [Husband] testified that none of the items listed in Exhibit 5 were stored at Capital Machine." *Id.* The trial court noted that it had granted Wife's request for a recess so that she could have the items stored at Capital Machine appraised and

> [t]he Court then ordered the sheriff of Hamilton County to take into custody [Husband] to be held pending a hearing set today at 3:30 on the issue of direct contempt; specifically, [Husband] is charged with having engaged in false testimony before this Court today regarding the disposition of property of the marital estate and its current location.

*Id.* at 130

[16]   Over thirty years ago, our supreme court held that giving false testimony in a judicial proceeding does not constitute direct contempt. *See e.g. In re Marriage of Neiswinger*, 477 N.E.2d 257, 260 (Ind. 1985); *In re Guardianship of C.M.W.*, 755 N.E.2d 644, 651 (Ind. Ct. App. 2001). Direct contempt "includes those actions occurring near the court, interfering with the business of the court, of which the judge has personal knowledge ." *In re Haigh*, 7 N.E.3d 980, 989 (Ind. 2014); *see also In re A.S.*, 9 N.E.3d 129, 132 (Ind. 2014) (stating contempt "is direct when it involves "acts which are committed in the presence of the court or in such close proximity to it so as to disrupt its proceedings while in session") (citation

omitted). Therefore, the trial court improperly alleged that Husband was in direct contempt of court for making false statements.[1]

[17] However, this determination was an error of law, the type of error that judges, as imperfect human beings, make from time to time. It is for this reason that judges are not held personally or ethically accountable for such errors of law. *See Sims v. Beamer*, 757 N.E.2d 1021, 1025 (Ind. Ct. App. 2001) (citing *Stump v. Sparkman*, 435 U.S. 349, 355-56 (1978)); Jud. Cond. Rule 2.2, cmt. 3.

[18] As a direct result of this error of law, Husband was jailed for nearly four hours. Upon a careful review of the transcript and further review of the trial court's careful and thoughtful consideration of the evidence in this complex dissolution, we cannot conclude that this error of law and Husband's resultant jailing establish that the trial court was biased or lacked impartiality. However, the trial court's decision to hold a direct contempt hearing after realizing that Husband was not sworn in before testifying that morning is more problematic.

[19] Husband was appointed counsel for the direct contempt hearing, but when Husband's appointed counsel argued that he had not had time to prepare for the hearing or review Husband's testimony, the trial court replied, "[Husband] has the right to prepare; you do not." Tr. Vol. 2, p. 131. And we may reasonably infer that Husband was in handcuffs for the length of the hearing. *See Id. at* 149–

---

[1] Husband's false testimony cannot be considered indirect contempt either. Indirect contempt involves acts committed outside the presence of the court "which nevertheless tend to interrupt, obstruct, embarrass or prevent the due administration of justice." *In re A.S.*, 9 N.E.3d at 132 (citations omitted).

50 (After the hearing was concluded, the court stated, "I told you to get those shackles off of [Husband] before. Why are they still on him? He has handcuffs on . . . Take it off now and he's released.")

[20] Husband and Wife's counsel testified about Husband's prior deposition testimony and testimony earlier that morning regarding the current location of the items that were allegedly sold to Shoffner. Both were examined by Husband's appointed counsel and the trial court.

[21] Immediately upon concluding the forty-minute hearing, the trial court entered an "adjudication of acquittal on the direct contempt" because

> [a]s indicated in the statement of direct contempt, [Husband] was never sworn as a witness today. [Husband] took the stand. Before he could reach the stand, his deposition was offered. Counsel then engaged in argument about the admission of his deposition. His deposition was admitted and Mr. Pennamped immediately began questioning [Husband], at which time Mr. Foland made an objection to his examination, which was overruled because he was asked, "What is your name? Objection." That was overruled. No further objections were made, nor was an objection ever made that the witness was not sworn.
>
> While technically it is correct that a person may not make a false statement before a Court, whether a witness or not a witness, and where this Court has no question in its mind whatsoever based upon the totality of the testimony today that [Husband] was not forthcoming with this Court or with his opposing counsel, I don't believe that the Court has established beyond a reasonable doubt, and I think that's the standard I should impose in this case, the allegations of criminal contempt.

*Id.* at 144–45 (emphasis added).

[22] The trial judge's error of law was clearly compounded by Husband's incarceration. And the judge's misunderstanding of the law was made even clearer by his comments at the contempt hearing. Husband's false statements as a witness would understandably anger any judge, but they did not constitute contempt, whether direct or indirect. Rather, the proper use of these statements was the reduction of Husband's credibility throughout, and the trial court did so.

[23] Because of this error of law and what proceeded from it, we can understand Husband's belief that the trial court was attempting to intimidate him and was biased against him. However, the trial court's error of law during the final hearing in extremely contentious dissolution proceedings, when considered with its subsequent findings and conclusions, do not indicate any such intimidation or bias. Therefore, Husband has not established that the trial court's alleged bias prejudiced his case.

[24] Husband also points to the trial court's remarks in its findings about his (lack of) credibility. We believe that Husband's consistently contentious demeanor and lack of truthfulness in this case over a two-year period had understandable and legally proper consequences. Under the unique facts and circumstances of this case, Husband has not established bias on the part of the trial judge. Moreover, the trial court's minor and mostly mathematical errors, which are discussed below, do not raise the specter of bias or a lack of impartiality.

# Division of the Marital Estate

[25] Because the trial court entered special findings of fact and conclusions thereon pursuant to Indiana Trial Rule 52, our standard of review is two-tiered: first, we determine whether the evidence supports the findings and, second, whether the findings support the judgment. *Marion Cnty. Auditor v. Sawmill Creek, LLC*, 964 N.E.2d 213, 216 (Ind. 2012). We view the evidence in the light most favorable to the judgment and defer to the court's findings if they are supported by the evidence or any legitimate inferences flowing therefrom. *Id*. at 216–17. Legal conclusions, on the other hand, are reviewed de novo. *Id*. at 217.

[26] The disposition of marital assets is within the dissolution court's sound discretion, and we will reverse only for an abuse of that discretion. *Eye v. Eye*, 849 N.E.2d 698, 701 (Ind. Ct. App. 2006). We consider only the evidence most favorable to the trial court's decision, without reweighing the evidence or assessing the credibility of witnesses. *Id*. The court abuses its discretion if its decision is clearly against the logic and effect of the facts and circumstances before the court, or if it has misinterpreted the law or disregards evidence of factors listed in the controlling statute. *Id*.

[27] Indiana Code section 31-15-7-5 provides that the trial court must divide the marital estate in a just and reasonable manner. An equal division is presumed just and reasonable, but a party may rebut this presumption by presenting evidence that an equitable division would not be just and reasonable, including evidence concerning the following factors:

(1) The contribution of each spouse to the acquisition of the property, regardless of whether the contribution was income producing.

(2) The extent to which the property was acquired by each spouse:

> (A) before the marriage; or

> (B) through inheritance or gift.

(3) The economic circumstances of each spouse at the time the disposition of the property is to become effective, including the desirability of awarding the family residence or the right to dwell in the family residence for such periods as the court considers just to the spouse having custody of any children.

(4) The conduct of the parties during the marriage as related to the disposition or dissipation of their property.

(5) The earnings or earning ability of the parties as related to:

> (A) a final division of property; and

> (B) a final determination of the property rights of the parties.

*Id.*

[28] A party challenging the trial court's division of marital property must overcome a strong presumption that the dissolution court "'considered and complied with the applicable statute, and that presumption is one of the strongest presumptions applicable to our consideration on appeal.'" *McCord v. McCord*, 852 N.E.2d 35, 44 (Ind. Ct. App. 2006) (quoting *DeSalle v. Gentry*, 818 N.E.2d 40, 44 (Ind. Ct. App. 2004)), *trans. denied*. Accordingly, we will reverse a property distribution only if there is no rational basis for the award, and

although the circumstances may have justified a different property distribution, we may not substitute our judgment for that of the dissolution court. *Augspurger v. Hudson*, 802 N.E.2d 503, 512 (Ind. Ct. App. 2004).

### A. Stipulated Value of 42.07 Acres

[29] Husband argues that the trial court abused its discretion when it assigned a lower value than the stipulated value to a parcel of land owned partially by the parties. We review the court's valuation of a marital asset for an abuse of discretion. *Weigel v. Weigel*, 24 N.E.3d 1007, 1010 (Ind. Ct. App. 2015). The trial court acts within its discretion where sufficient evidence and reasonable inferences support the court's valuation. *Id.* at 1011.

[30] Relying on an appraisal, the parties stipulated that the value of the 42.07-acre real estate was $841,400. Once parties enter into a stipulation and the court approves it, the stipulation is binding upon all involved. *Ehle v. Ehle*, 737 N.E.2d 429, 433–34 (Ind. Ct. App. 2000).

[31] On her "Marital Balance Sheet and Proposed Distribution," Wife listed the value of the 42.07-acre property as $841,400" less $126,210. Ex. Vol. 6, Petitioner's Ex. 2. Husband did not object to the exhibit or Wife's inclusion of the marketability discount. The trial court properly included the discount because the parties are unable to sell the real estate without the agreement of the three other owners of the property.

### B. Assets Sold to Shoffner

[32] Next, Husband argues that the trial court abused its discretion when it credited certain property to him that the trial court specifically found were not marital assets. Specifically, in finding numbers 29 and 30, the trial court found that items that Husband sold to Shoffner in a bill of sale dated March 16, 2013 are not marital assets and would not be included in the martial estate. Appellant's App. Vol. 2, pp. 44–45. The court also found that Husband sold the items listed in the bill of sale for a significantly lower price than their market value, and by doing so, Husband dissipated martial assets. The trial court concluded that it was possibly a "sham transaction." *Id*. at 46.

[33] The trial court later assigned a value of $24,350 to the items the trial court found were not marital assets in finding numbers 29 and 30, and awarded the equipment to Husband. Husband maintains that these are the items sold to Shoffner, and therefore, the trial court erred when it awarded non-marital assets to Husband in the dissolution decree. Wife does not dispute Husband's claim that the property valued at $24,350 and awarded to Husband was the property allegedly sold to Shoffner for $2,000 in 2013. However, Wife argues that the "Court included the stated number, $24,350.00, to account for" Husband's dissipation of the martial estate as a deviation factor. Appellee's Br. at 30.

[34] In *Pitman v. Pitman*, 721 N.E.2d 260 (Ind. Ct. App. 1999), *trans. denied*, our court observed that "a party's dissipation of martial assets only affects the distribution of the martial property in which the parties possess a present vested interest at the time of dissolution." *Id.* at 266 (citing *In re Marriage of McNanama*,

272 Ind. 482, 487, 339 N.E.2d 371, 373 (1980)). In *Pitman*, the husband acquired shares of stock during the marriage but sold them to his sister prior to filing the petition for divorce so that his wife would not realize any gain from the shares. Our court concluded that the shares of stock "were not part of the martial estate at the time the petition was filed, and their value was not subject to distribution as marital assets." *Id*. Therefore, the trial court erred when it awarded a monetary judgment to the wife to compensate her for the loss of the shares of stock because the judgment "disregards the principle that 'a trial court may not compensate a party for pre-separation dissipation[.]'"[2] *Id*. at 267 (citing *In re Marriage of Sloss*, 526 N.E.2d 1036, 1040 (Ind. Ct. App. 1988)). *See also Armstrong v. Armstrong*, 181 Ind. App. 343, 346–47, 391 N.E.2d 855, 857 (1979) (stating that "while evidence of dissipation of the marital assets is a [f]actor in dividing the marital property[,] I.C. 31-1-11.5-11(d) (Burns Code Ed. Supp.1978), it does not, standing alone, allow the trial court to enlarge the marital estate beyond that property in which the parties maintain a present vested interest").

[35] The trial court properly considered the sale of the assets sold to Shoffner as evidence of dissipation. However, the trial court entered conflicting findings as

---

[2] A trial court may consider evidence of pre- or post- separation dissipation to determine whether a party has dissipated assets. *Layne v. Layne*, 77 N.E.3d 1254, 1263 (Ind. Ct. App. 2017). To the extent our court implied otherwise in *Pitman*, it was incorrect. *Id*. A trial court "may compensate a spouse for pre-separation dissipation of martial assets as long as such compensation comes from martial assets in which the parties have a vested present interest at dissolution and not, for instance, from a spouse's future income." *Id*. at 1264 (citing *In re McManama*, 272 Ind. at 487, 399 N.E.2d at 373).

to whether the assets should not be included in the marital estate (because they were sold before the parties' separation) or should be included because the sale was a fraudulent transaction. We therefore remand to the trial court with instructions to resolve the conflict in these findings and modify its division of the marital estate if necessary.

### C. Value of Capital Machine

[36] Third, Husband argues that the trial court abused its discretion by relying on Wife's expert's testimony in its valuation of Capital Machine. We will affirm a trial court's valuation of marital assets as long as evidence is sufficient and reasonable inferences support the valuation. *Morey v. Morey*, 49 N.E.3d 1065, 1069 (Ind. Ct. App. 2016). We will not reweigh the evidence and will consider the evidence in the light most favorable to the judgment. *Id*. Although the facts and reasonable inferences might allow for a different conclusion, we will not substitute our judgment for that of the trial court. *Id.*

[37] Husband argues that Wife's expert used "book values" to calculate the value of Capital Machine's inventory instead of fair market value. Book value, an accounting term, refers to the historical cost of an item. Tr. Vol. 2, p. 241. Husband's expert testified that "book value has no fundamental basis in business valuation." Tr. Vol. 3, p. 139. Wife's expert believed that the inventory report he used for his valuation listed the fair market value of Capital Machine's inventory. *Id*. at 60–61. Husband's testimony was the only evidence admitted to support Husband's claim that the inventory report contained "book value" for the company's inventory.

[38]     Wife argues that her expert properly relied on Capital Machine's income tax returns and the value of the inventory reported to the Internal Revenue Service to calculate the business's value. And Wife observes that her expert properly applied a marketability discount to his overall valuation of Capital Machine.

[39]     To arrive at a value for Capital Machine, Wife's expert reviewed the company's tax returns from 2009 through 2014, its internal financial statements, inventory valuation sheets, inventory calculation reports, real estate appraisals, and Husband's expert's reports. *Id.* at 2. Wife's expert explained that he used "the net asset approach" to calculate Capital Machine's value as of June 30, 2014. *Id.* at 4–5. He primarily used the company's 2013 and 2014 tax returns to do so because "tax return numbers are indicative of fair market value of inventory." *Id.* at 7–8. The expert also believed that the tax returns contained the most reliable data available to him to calculate the company's value. *Id.* at 10.

[40]     Wife's expert admitted that he did not appraise the company's inventory because he is not a qualified appraiser. He testified that he had to rely on information Husband supplied to him to determine the value of Capital Machine's inventory. *Id*. at 30. Husband's own expert testified that Capital Machine's financial reporting was "just dismal." *Id*. at 83–84. And both experts used the net asset approach to calculate Capital Machine's value.

[41]     The trial court was tasked with weighing the testimony of the parties' experts to determine the value of Capital Machine. And we do not agree with Husband's argument that Wife's expert and the trial court were confused about whether

the values listed on the company's inventory were book value or fair market value. The only evidence that the values were book values was Husband's testimony, and it was within the discretion of the trial court to discredit that testimony. For all of these reasons, we conclude that the trial court properly relied on Wife's expert's testimony to value Capital Machine.

### D. Mathematical Error

Husband also argues that even if our court accepts the trial court's method for valuing Capital Machine, the trial court made a mathematical error and overstated the value of his 51.5625 share of the company by $77,674.00. Wife agrees that the trial court's error "may require correction of the judgment to reflect the value the trial court intended to utilize[.]" Appellee's Br. at 36.

Throughout its findings, the trial court mistakenly overstated Husband's share of Capital Machine as 51.625%, when his share is actually 51.5625%. Also, the trial court calculated the value of Capital Machine as $831,589 in finding number 53. But in its division of the marital assets and calculation of the marital estate, the trial court listed the value as $931,589, which appears to be a scrivener's error. In his brief, Husband applied the same calculation of Capital Machine that the trial court described in finding number 53, and calculated a value of $853,915, which calculation appears to be correct. Because the trial court's findings are inconsistent concerning the value of Capital Machine, on remand, we direct the trial court to recalculate the value of Capital Machine and modify its judgment if necessary.

## E. Wife's Cadillac

[44]    Because we are remanding this case, we also instruct the trial court to correct its judgment to reflect that Wife sold her Cadillac for $11,000, and not $10,300 as reported in finding number 48. Tr. Vol. 2, p. 25. The $700 difference is *de minimis* considering the value of the marital estate, but on remand, it should be corrected.

## F. Inheritance and Gifts from Husband's Family

[45]    Husband also argues that the trial court abused its discretion by refusing "to give any consideration to the significant gifts and inheritance" totaling over $4,000,000 received from Husband's family during the marriage. Appellant's Br. at 39. Contrary to Husband's argument, the trial court did consider the substantial gifts Husband's family made to the parties throughout their marriage. The trial court found:

> At the time of the marriage and thereafter, frequent and substantial gifts were given to the Respondent and Petitioner by the Respondent's parents. In addition, substantial inheritances were received upon the death of the Husband's Father and the subsequent death of Husband's Mother. It is unclear from the record herein whether the inheritances and gifts were always directed solely to the Respondent or made jointly to the parties or if both circumstances occurred. The manner in which the inheritances and gifts were received are of little consequence because the inheritances were used jointly by the parties and the funds received were commingled with other martial funds and properties.

Appellant's App. Vol. 2, pp. 35–36.

Husband invested significant sums he inherited from his family in the failed business ventures and to pay the debt on the marital residence. The debt on the marital residence was incurred in part to fund the parties' businesses. Furthermore, the trial court weighed the fact that the parties' received substantial assets from Husband's family against Husband's dissipation of marital assets and attempt to hide certain assets from Wife and the trial court. The trial court properly considered all of these circumstances when it divided the marital estate.

## G. The Veneer Mill

Husband also argues that the trial court abused its discretion when it considered his failed business venture to constitute dissipation of marital assets. Dissolution courts may consider evidence of either pre- or post-separation dissipation. *Kondamuri v. Kondamuri*, 852 N.E.2d 939, 952 (Ind. Ct. App. 2006). Dissipation generally involves the use or diminution of the marital estate for a purpose unrelated to the marriage and does not include the use of marital property to meet routine financial obligations. *Balicki v. Balicki*, 837 N.E.2d 532, 540 (Ind. Ct. App. 2005), *trans. denied*; *Coyle v. Coyle*, 671 N.E.2d 938, 943 (Ind. Ct. App. 1996).

Dissipation of marital assets may also include the frivolous and unjustified spending of marital assets. *Grathwohl v. Garrity*, 871 N.E.2d 297, 303 (Ind. Ct. App. 2007). "'The test for dissipation is whether the assets were actually wasted or misused.'" *Id.* (quoting *Balicki*, 837 N.E.2d at 540)). To determine whether dissipation has occurred, we consider the following factors:

1. Whether the expenditure benefited the marriage or was made for a purpose entirely unrelated to the marriage;
2. The timing of the transaction;
3. Whether the expenditure was excessive or *de minimis*; and
4. Whether the dissipating party intended to hide, deplete, or divert the marital asset.

*Kondamuri*, 852 N.E.2d at 952 (Ind. Ct. App. 2006) (citing *Coyle*, 671 N.E.2d at 943).

[49] The trial court found in pertinent part:

> 12. [Wife] opposed the veneer mill venture, but [Husband] proceeded anyway. [Wife] acquiesced and executed many documents necessary to fund this startup operation. [Wife] to this date in [sic] unable to describe exactly how the funds for this venture were raised, but it appears that nearly everything the parties owned was put at risk. The business failed in part due to the effects the advent of a global economy has had upon the veneer industry, but the decision to risk the entire marital estate of the parties to fund this venture was solely the decision of [Husband].

> 17. The Shelborne Road house . . . was held free and clear before the veneer mill bankruptcy. This residence was nearly lost in the business failure because a mortgage had been taken on the residence to partially fund that venture. The Residence was saved from foreclosure only when the mortgage taken out on the residence to fund the mill was paid after [Husband] received his inheritance from his mother. The Court finds that this residence should be set over to the Wife. It was paid for the first time, at least in part, from joint efforts of the parties, and while it was paid for the second time from the Husband's inheritance, which was only because of Husband's ill-advised decision to risk the family estate to fund the failed veneer mill.

Appellant's App. Vol. 2, pp. 37, 40. The trial court considered the "[l]oss of most of the net worth of this martial estate in the failed veneer mill which was done over the objection of [Wife]" as one of the many reasons justifying deviation from the presumption of an equal division of the marital estate. *Id*. at 62.

[50] The trial court did not consider the fact that the business failed as dissipation of marital assets. And we conclude that the trial court acted within its discretion when it considered Husband's decision, importantly over Wife's objections, to put most of the marital assets at risk to fund the veneer mill as misconduct.

## Attorney Fees

[51] Finally, Husband argues that the trial court abused its discretion when it "failed to consider the parties' resources and their relative economic circumstance when ordering Husband to pay" $60,000 of Wife's attorney fees and $19,000 of her expenses. Appellant's Br. at 41. Under Indiana Code section 31-15-10-1, a dissolution court has broad discretion to impose attorney's fees on either party to a dissolution proceeding. *Barton v. Barton*, 47 N.E.3d 368, 377 (Ind. Ct. App. 2015), *trans. denied*. An attorney fee award will be reversed only if it is clearly against the logic and effect of the facts and circumstances before the court. *Brown v. Brown*, 776 N.E.2d 394, 397 (Ind. Ct. App. 2002), *trans. denied*.

[52] To determine whether to award attorney fees, "a trial court must consider the resources of the parties, their economic condition, the ability of the parties to engage in gainful employment and to earn adequate income, and such other

factors as bear on the reasonableness of the award." *Allen v. Proksch*, 832 N.E.2d 1080, 1102 (Ind. Ct. App. 2005) (citations and internal quotation marks omitted). The court may also take into account any misconduct by one party that causes the other party to directly incur additional fees. *Id*. When one party is in a superior position over the other to pay fees, an award of attorney fees is proper. *Troyer v. Troyer*, 987 N.E.2d 1130, 1143 (Ind. Ct. App. 2013), *trans. denied*.

[53] To support its award of attorney fees to Wife, the trial court made the following findings:

> 76. [Wife] has incurred attorney fees of in excess of $70,000 as of the close of the third day of trial. After the preparation and submission of Exhibit 4 there was a fourth day of trial and at least one post trial filing. The court finds these fees to be wholly reasonable given the nature of this case and specifically the apparent concerted effort by [Husband] to do anything necessary to preclude an orderly division of this marital estate based upon law and equity. Repeatedly, efforts were made to compel discovery and in each instance [Husband] was found to be delinquent. Repeated hearings were held herein for the advance distribution of maritall assets, generally by [Husband], based upon a need for cash to maintain the marital estate and business at the time the business and [Husband] had access to in excess of a quarter of a million dollars to meet necessary expenses. Last but not least a good deal of time was spent investigating the extent of the marital estate and proving, without a doubt, that [Husband] has intentionally and deliberately hidden assets and then made false statements about his conduct.

> 77. [Wife] has incurred litigation expenses herein including title search fees, Appraisal Fees before trial, business valuation, Depositions and nonparty discovery costs in excess of $14,700.

In addition, other costs were incurred during trial for testimony of experts and the unusual property valuation on the first day of trial totaling $4,650. The total of these expenses documented by invoice in the record exceeds $19,000. This specifically does not include any expert fees paid by the Petitioner for Testimony at trial.

Appellant's App. Vol. 2, pp. 63–64.

[54] Neither party has significantly more resources at its disposal than the other following the dissolution of their marriage. But Husband has a substantial tax benefit, i.e. a net operating loss carryover of more than $4,500,000, which allows him to receive ordinary income during the life of the carryover without paying federal income taxes thereon. *Id.* at 62. More importantly, Husband's misconduct during the dissolution proceedings was well documented by the trial court in its findings of fact. Without question, Wife's expenses and attorney fees increased due to Husband's misconduct. For this reason, we conclude that the trial court acted within its discretion when it ordered Husband to pay a portion of Wife's attorney fees and her expenses.

# Conclusion

[55] The record clearly establishes that Husband was a consistently recalcitrant, untruthful and devious litigant throughout two years of the dissolution proceedings. This conduct led to strong, albeit erroneous, legal conclusions by the trial judge, with attendant consequences. However, Husband has not established that alleged bias on the part of the trial judge prejudiced his case.

Concerning the division of the marital estate, the trial court entered inconsistent findings concerning whether the items sold to Shoffner were marital assets, and therefore, we remand this case to resolve that inconsistency and to correct the mathematical error in the trial court's calculation of its value of Capital Machine. In all other respects, we affirm the trial court's judgment.

Affirmed in part, reversed in part and remanded for correction of the findings and conclusions entered by the trial court consistent with this opinion.

Kirsch, J., and Altice, J., concur.